**In re William S. CARSON, Debtor.**

**Bankruptcy No. 98–4170–RLB–13.**

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

Oct. 1, 1998.

Dennis M. Ostrowski, Mapother & Mapother, Louisville, KY, for Creditor Chrysler Financial Corp.

Chad C. Duran, Allison Engine Legal Services Plan, Indianapolis, IN, for Debtor.

Robert A. Brothers, Office of the Chapter 13 Trustee, Indianapolis, IN, Chapter 13 Trustee.

## ENTRY ON OBJECTION TO CONFIRMATION

ROBERT L. BAYT, Bankruptcy Judge.

This matter is before the Court on the Motion to Sustain Continuing of Objection to Chapter 13 Plan ("Objection to Confirmation"),[1] filed by Chrysler Financial Corporation ("Chrysler Financial") on July 27, 1998. A hearing on the Objection to Confirmation was held on September 1, 1998. The Court, having reviewed the Objection to Confirmation, the various related pleadings filed by the parties, and the matters presented at the September 1, 1998 hearing, now makes the following Entry.

William S. Carson (the "Debtor") filed a petition under Chapter 13 on March 27, 1998. Prior to the petition filing, the Debtor purchased a 1997 Dodge Ram (the "Truck"). Chrysler Financial provided the funds for the purchase. The Debtor now owes Chrysler Financial approximately $30,000. The Truck is currently worth approximately $20,750.

On June 8, 1998, the Debtor filed a second amended plan (the "Plan"), in which the Debtor proposes to pay Chrysler Financial the fair market value of the Truck, plus 8%

---

1. The Debtor filed his first plan on March 27, 1998, to which Chrysler filed an objection on May 13, 1998. The Debtor filed an amended plan on May 19, 1998, to which Chrysler filed an objection on June 3, 1998. The Debtor filed a second amended plan on June 8, 1998, to which Chrysler responded by filing the instant Motion to Sustain Continuing of Objection to Chapter 13 Plan.

Chrysler raises several issues in its Motion to Sustain Continuing of Objection, only one of which is addressed by the Court today: whether the 8% interest rate proposed by the Debtor with respect to the loan secured by the Debtor's 1997 Dodge Ram truck, meets the "cramdown" requirements of 11 U.S.C. Section 1325(a)(5)(B)(ii).

interest.[2] Chrysler Financial has objected to the 8% interest rate that the Debtor proposes to pay, arguing that the Debtor should pay the 10% rate that is standard for the Southern District of Indiana, Indianapolis Division.[3]

### "Cramdown" Pursuant to Section 1325(a)(5)(B)(ii)

11 U.S.C. Section 1325(a)(5) governs the treatment of secured claims in Chapter 13.[4] Pursuant to Section 1325(a)(5), there are three ways to treat a secured claim in a Chapter 13 plan. First, the debtor can gain the secured creditor's acceptance of the plan. *See* Section 1325(a)(5)(A). Secondly, the debtor can "cramdown" the claim to fair market value, and pay the reduced claim over the life of the plan. *See* Section 1325(a)(5)(B). Thirdly, the debtor can surrender the collateral to the holder of the secured claim. *See* Section 1325(a)(5)(C).

Where, as here, a debtor proposes to cramdown a secured claim, Section 1325(a)(5)(B) sets out two requirements: a) the secured claimant must retain its lien on the collateral, and b) the undersecured secured claimant must be paid the fair market value of the collateral. Additionally, because the secured claimant will be receiving payments over time, Section 1325(a)(5)(B)(ii) requires that an interest factor be incorporated into the payments to be made to the secured creditor.

> The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position economically as if the debtor exercised the option of surrendering the collateral. Through the payment of interest, the creditor is compensated for the delay in receiving the amount of the allowed secured claim, which would be received in full immediately upon confirmation if the collateral were liquidated.

8 *Collier on Bankruptcy*, page 1325–35.

Here, the Debtor proposes to pay Chrysler Financial 8% interest, to compensate for the fact that Chrysler Financial cannot immediately repossess the Debtor's Truck worth $20,750 (and presumably re-sell it), but instead, will be receiving payments over the life of the Debtor's Plan. Chrysler Financial argues, to the contrary, that it should be paid 10% interest, because that rate of interest has been the standard rate of interest in this district for many years.

### Determining the Appropriate Discount Rate: Three Different Approaches

The decisions that have discussed the interest rate to be paid to secured creditors in Chapter 13 are not easy to categorize. The decisions can be roughly divided into three categories: [5]

**2.** At the hearing held on September 1, 1998, counsel for the Debtor argued that the interest rate should be the T-bill rate plus 2%, or approximately 7%.

**3.** In the Southern District of Indiana, Indianapolis Division, for approximately 20 years the Chapter 13 Trustee has taken the position that the appropriate rate of interest for loans secured by automobiles is 10%. At the September 1, 1998 hearing, the Chapter 13 Trustee asserted that for reasons of practicality, the 10% rate should remain the standard rate.

**4.** 11 U.S.C. Section 1325(a)(5) provides as follows with respect to secured claims:

    (a) ... the court shall confirm a plan if—

    ...

    (5) with respect to each allowed secured claim provided for by the plan—

      (A) the holder of such claim has accepted the plan;

      (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

      (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

      (C) the debtor surrenders the property securing such claim to such holder.

**5.** The recent decision by the Seventh Circuit in *Koopmans v. Farm Credit Serv. of Mid–America, ACA*, 102 F.3d 874 (7th Cir.1996), does not fit neatly into any of the three categories.

    The Fifth Circuit has characterized the *Koopmans* decision as taking a "forced loan" approach. *Matter of Smithwick*, 121 F.3d 211, 214 (5th Cir.1997). The Second Circuit, on the other hand, has cited the *Koopmans* decision as supporting both the "forced loan" approach and the "cost of funds" approach. In *In re Valenti*, 105 F.3d 55, 63 (2nd Cir.1997).

1) those courts taking the "forced loan" approach,[6]

2) those courts taking the "cost of funds" approach,[7] and

3) the approach taken by the Second Circuit (the "Second Circuit approach").

The three approaches are described as follows in the National Bankruptcy Review Commission Final Report:

### [The Forced Loan Approach]

Some courts endorse the use of a market rate of interest and have found that the nondefault contract rate presumptively is the market rate absent evidence to the contrary. According to this view, the objective of section 1325(a)(5)(B)(ii) is to put the creditor in the same economic position as if it received the value of its allowed claim immediately. Sometimes called the 'forced loan' rule, this approach bases the section 1325(a)(5)(B)(ii) interest rate [on] what the creditor charges for loans of similar character, amount, and duration to debtors in the same geographic region. Because Chapter 13 cases involve small dollar amounts that could be consumed in litigation expenses if the rules are too complicated, courts taking this approach may presume that the contract rate is the market rate.

### [The Cost of Funds Approach]

Other courts use a different market rate, the 'cost of funds' to the creditor. Thus, the rate that should be paid is what the creditor pays to borrow funds. According to this view, assuming that the creditor would borrow the money representing the value of its allowed claim is the best way to put a creditor in the same economic position as if the debtor surrendered the collateral immediately. The creditor then could make new loans to consumers at prevailing rates in the commercial market. The proponents of the approach believe that the forced loan rate used by other courts contains an element of profit that should not be included in the cramdown interest rate, lest the creditor receive more than the present value of its allowed claim. They argue that courts should not award profit, administration costs, risk, industry transactional costs, costs of collection, and the other extra elements that go into a contract interest rate.

### [The Second Circuit Approach]

A third method employs the cost of funds approach, but also attempts to reconcile the fact that it provides nonuniform treat-

---

In the National Bankruptcy Review Commission Final Report, the *Koopmans* decision is characterized as taking a "cost of funds" approach. Appendix G *Collier on Bankruptcy*, fn. 678, page App.Pt. 44–269 (reproducing in its entirety the National Bankruptcy Review Commission Final Report). Another commentator has described the *Koopmans* decision as taking a "cost of funds" approach, but in the same article, summarizes the *Koopmans* decision as having "essentially adopted a 'forced rate.'" ' Timothy D. Moratzka, *Chapter 13 Interest Rate Pegged to Treasury Rate in Second Circuit*, 14 Am.Bankr. Inst.J. 16, 16 (1997).

6. *See, e.g., Matter of Smithwick*, 121 F.3d 211 (5th Cir.1997); *General Motors Acceptance Corp. v. Jones*, 999 F.2d 63 (3rd Cir.1993); *United Carolina Bank v. Hall*, 993 F.2d 1126 (4th Cir. 1993); *In re Hardzog*, 901 F.2d 858 (10th Cir. 1990) (determining rate to be applied in Chapter 12); *United States v. Neal Pharmacal Co.*, 789 F.2d 1283 (8th Cir.1986); *Matter of Southern States Motor Inns. Inc.*, 709 F.2d 647 (11th Cir. 1983); *Memphis Bank and Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982); *In re Segura*, 218 B.R. 166 (Bankr.N.D.Okla.1998); *In re Smith*, 192 B.R. 563 (Bankr.W.D.Okla.1996); *In re Mellema*, 124 B.R. 103 (Bankr.D.Colo.1991).

7. *See, e.g., In re Fowler*, 903 F.2d 694 (9th Cir. 1990) (determining rate to be applied in Chapter 12); *United States v. Doud*, 869 F.2d 1144 (8th Cir.1989) (approving a T-bill plus 2% rate in a Chapter 12 case); *In re Shannon*, 100 B.R. 913 (S.D.Ohio 1989); *Matter of Jones*, 219 B.R. 506 (Bankr.N.D.Ill.1998); *In re Dingley*, 189 B.R. 264 (Bankr.N.D.N.Y.1995); *In re Smith*, 178 B.R. 946 (Bankr.D.Vt.1995) (determining rate to be applied in Chapter 12); *In re DeMaggio*, 175 B.R. 144 (Bankr.D.N.H.1994); *In re Collins*, 167 B.R. 842 (Bankr.E.D.Tex.1994); *Matter of Jordan*, 130 B.R. 185 (Bankr.D.N.J.1991); *In re Hudock*, 124 B.R. 532 (Bankr.N.D.Ill.1991); *In re Breisch*, 118 B.R. 271 (Bankr.E.D.Pa.1990); *Matter of Lassiter*, 104 B.R. 119 (Bankr.S.D.Iowa 1989); *In re Fisher*, 29 B.R. 542 (Bankr.D.Kan.1983); *Matter of Campbell*, 16 B.R. 496 (Bankr.N.D.Ill.1982).

ment to Chapter 13 debtors. This consideration led the Second Circuit to hold that the market rate of interest under section 1325(a)(5)(B)(ii) should be fixed at the prevailing rate of a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan. Because the rate on a treasury bond is virtually risk-free, the court also found that the cramdown interest rate should include a premium to reflect the risk that the creditor bears in receiving deferred payments under the reorganization plan. The Second Circuit held that a risk premium should be added to the prevailing interest rate, suggesting that a premium of 1–3% would be appropriate, but left the ultimate determination to the discretion of the bankruptcy judge.

Appendix G *Collier on Bankruptcy,* pages App.Pt. 44–268 to 44–270 (footnotes omitted).

### *The Rate to be Applied Here*

■ The Debtor argued at the September 1, 1998 hearing, that the Court should adopt a T-bill plus rate. The Court chooses to instead follow the lead of the Seventh Circuit in *Koopmans v. Farm Credit Serv. of Mid–America, ACA,* 102 F.3d 874 (7th Cir.1996), and adopt a prime-plus rate.

According to the Seventh Circuit, the prime rate is a better starting place than the T-bill rate, because no creditor (other than the United States government) borrows at the lower, risk-free T-bill rate. The best commercial borrowers pay the higher prime rate, and less credit-worthy commercial borrowers pay rates sometimes well above the prime rate. As the Seventh Circuit explained in *Koopmans:*

The prime rate of interest is the benchmark rate for the banks' most credit-worthy customers, but even blue-chip [borrowers] are more likely to default than is the United States government, so the prime rate exceeds the T-bill rate. Because the prime rate includes some compensation for the risk of non-repayment, the add-on for

less credit-worthy customers is less than it would be if the court started with the risk-free T-bill rate.... Because adjustments would make the final interest rate the same whether the bankruptcy court starts with the prime rate or the T-bill rate, the choice of nomenclature is irrelevant-although it is best to stick with the market's approach to estimating the risk premium. On this record, the market's approach is prime-plus.

*Koopmans v. Farm Credit Services of Mid–America, ACA,* 102 F.3d 874, 875 (7th Cir. 1996) (citations omitted).

In adopting a prime-plus standard, the question arises as to which date is the appropriate date for determining the prime rate to be applied in a particular case. The Bankruptcy Code points to the date of confirmation as the appropriate date, but there are practical problems with choosing that date. "The creditor could not know the value of its claim until confirmation, and the trustee and debtor could not calculate the amount of payments required under the plan until after the plan's confirmation." *In re Hudock,* 124 B.R. 532, 534 (Bankr.N.D.Ill.1991). For reasons of practicality, and because the prime rate on the date of filing is usually the same as, or very close to, the prime rate on the date of confirmation, the Court will adopt the date of the petition filing, as the date for determining the prime rate to be applied in a particular case.

■ In adopting a prime-plus rule, the Court must determine the appropriate "plus" factor, or risk premium. The risk factor need not be large.

The risk factor in such a calculation need not be large for several reasons. First, the creditor's main protection against risk comes from its right to seek adequate protection from the outset of the case, from its right to retain its lien, and from its right to seek dismissal of the case in the event of a material default in payments, which would restore the creditor's prebankruptcy remedies. Moreover, in consumer finance transactions in which annual percentage rates are relatively high, the primary factors determining those rates do not relate

to risk, especially when the debt is secured, but to high costs of marketing, high transaction costs relative to the amount of the debt, and consumers'· failure to effectively shop for lower rates due to various imperfections in the market.

8 *Collier on Bankruptcy*, pages 1325–37 to 38. As the bankruptcy court pointed out in *In re Dingley*, 189 B.R. 264, 272 (Bankr. N.D.N.Y.1995), creditors enjoy several protections against risk in Chapter 13. At confirmation, a Chapter 13 debtor must show that he is financially able to make all payments under the plan. The disclosure and review requirements of Chapter 13 provide creditors with an enhanced ability to assess the debtor's ability to service debt. Wage orders can be used in Chapter 13 to eliminate the risk of a debtor inadvertently defaulting on a monthly payment. The risk of default on a Chapter 13 secured debt is further reduced by the debtor's reduction of, or restructure of, unsecured debt. *In re Segura*, 218 B.R. 166 (Bankr.N.D.Okla.1998). Finally, as the bankruptcy court noted in *In re Fisher*, 29 B.R. 542, 544–545 (Bankr.D.Kan. 1983), costs of collection, such as garnishment and self-help repossession, are eliminated in Chapter 13, and costs of administration are largely borne by the Chapter 13 trustee.

■ The Second Circuit has chosen a risk premium of 1–3%, to be added to the appropriate T-bill rate. *In re Valenti*, 105 F.3d 55 (2nd Cir.1997)(citing bankruptcy cases that have applied risk premiums in the 1–3% range). In *Koopmans v. Farm Credit Serv. of Mid–America, ACA*, 102 F.3d 874 (7th Cir.1996), a Chapter 12 case, the Seventh Circuit affirmed the lower court's application of a 1.5% risk premium (to be added to the prime rate). Here, given the relative lack of risk in extending a loan to this debtor, the Court finds that a risk premium equal to 1.5% is appropriate. The risk premium adopted by the Court today, *i.e.* 1.5%, will be the standard for cases before this Court. The norm throughout the country appears to be 1–3%. A middle ground approach provides for easy application and certainty, thereby reducing the cost and time involved in litigation of the issue.

## The Interest Rate Proposed in the Debtor's Plan

In the instant case, the Debtor proposes to pay Chrysler Financial 8% interest over the life of the Plan. Given the standard adopted by the Court today, prime [currently 8.5%] plus 1.5% for risk, the 8% rate proposed by the Debtor in his Plan is not sufficient to pay Chrysler Financial the present value of its claim, and is not sufficient to meet the cramdown requirement of Section 1325(a)(5)(B)(ii). Accordingly, Chrysler Financial's objection to the Debtor's Plan should be sustained.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the Motion to Sustain Continuing of Objection to Chapter 13 Plan, filed by Chrysler Financial Corporation, be, and hereby is, GRANTED, to the extent that the Court hereby HOLDS that the 8% rate of interest that the Debtor proposes in the Plan, for the loan secured by the Truck, does not meet the requirements of 11 U.S.C. Section 1325(a)(5)(B)(ii).