# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 00-4167

IN RE:

LEE M. TILL and AMY M. TILL,

*Debtors-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00 C 1102—**Larry J. McKinney**, *Chief Judge.*

ARGUED APRIL 10, 2002—DECIDED AUGUST 21, 2002

Before RIPPLE, MANION and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Lee and Amy Till filed for bankruptcy protection under Chapter 13. SCS Credit Corporation, a secured creditor, objected to confirmation of the Tills' Chapter 13 plan on the ground that the interest rate SCS would be paid under Chapter 13's "cramdown" provision, *see* 11 U.S.C. § 1325(a)(5)(A)(ii), was insufficient. The bankruptcy court confirmed the plan over SCS' objection; it held that the proper interest rate was the prime rate plus a risk adjustment of 1.5%. SCS appealed. The district court reversed the bankruptcy court's decision; it concluded that the "coerced loan" theory applied, and, consequently, that the interest rate should be based on what SCS would receive for a loan of similar risk and dur-

ation. The district court stayed remand of its order pending the Tills' further appeal to this court. For the reasons set forth in the following opinion, we vacate the judgment of the district court and remand the case for further proceedings with instructions.

# I
## BACKGROUND

Lee and Amy Till jointly filed for bankruptcy protection under Chapter 13. SCS Credit Corporation was the only creditor to object to confirmation of the Tills' amended Chapter 13 plan. SCS is a secured creditor and holds a security interest in an automobile. The vehicle was valued at $4,500. SCS is a sub-prime lender, which means that it services borrowers with credit histories too poor to qualify for prime-rate auto loans. The Tills are such borrowers. The interest rate on the Tills' loan was 21%. The Tills' plan invoked the "cramdown" provision of Chapter 13.

Under Chapter 13's cramdown provision, a bankruptcy plan will be confirmed over the objection of a secured creditor if the creditor retains its lien on the collateral, and the creditor receives cash payments over the course of the plan that are equivalent to the value of the collateral on the plan's effective date. *See* 11 U.S.C. § 1325(a)(5)(B). To achieve this statutory requirement, the bankruptcy court must determine the value of the collateral, and the debtor must pay interest to account for the time value of money. Under the Tills' reorganization plan, the interest rate on SCS' secured claim would be 9.5%. SCS contended that this rate would not provide SCS with the present value of its collateral, as required by the cramdown provision. SCS submitted that the rate should be 21%, the interest rate it would have

earned if SCS had foreclosed on the vehicle, sold it and then reinvested the proceeds in another sub-prime auto loan.

The bankruptcy court conducted a hearing to consider SCS' objection. The Tills presented the testimony of a finance professor who testified that an interest rate of 9.5%, which he based on the prime rate plus a risk premium of 1.5%, would be sufficient. He admitted, however, that he had no experience working for a creditor and only a limited understanding of the sub-prime auto lending market. SCS presented the testimony of its general manager, Neil Bird, and the sales manager of Instant Auto Finance, which had written the loan to the Tills and then had assigned it to SCS. Both witnesses testified that SCS had received 21% interest on all of its loans because borrowers like the Tills are poor credit risks. Bird also testified that SCS usually did not get paid the full amount under Chapter 13 plans because the debtors often cannot fulfill their obligations under the plan.

The bankruptcy court interpreted our decision in *Koopmans v. Farm Credit Services of Mid-America*, 102 F.3d 874 (7th Cir. 1996), to endorse a prime rate plus a risk premium method of calculating the proper cramdown interest rate. The court rejected the "coerced loan" theory of the cramdown provision advocated by SCS. Following what it believed to be the holding of *Koopmans*, the bankruptcy court confirmed the Tills' plan with an interest rate of 9.5% applied to SCS' claim.

SCS then appealed to the United States District Court for the Southern District of Indiana. SCS reasserted its argument that it was entitled to 21%, the rate it would earn on a loan if it had foreclosed on the collateral and then had used the proceeds to issue a new loan. The district court agreed. The court held that the bankruptcy court had misread *Koopmans* and that *Koopmans* required

that SCS receive the interest rate it would have earned on a new loan financed by the proceeds from the sale of its collateral. Based on the record in the bankruptcy court, the district court concluded that 21% was the proper rate and accordingly reversed the bankruptcy court's decision. The Tills now appeal that decision to this court.

## II

## DISCUSSION

### A.

The issue before us—the appropriate approach to determine the applicable interest rate under Chapter 13's cramdown provision—first presents us with a question of statutory interpretation. We review this question de novo. The application of that method to the particular facts of this case is reviewed for clear error. *See In re Smithwick*, 121 F.3d 211, 215 (5th Cir. 1997).

The Tills submit that we should reverse the district court and reinstate the bankruptcy court's decision. In their view, a "market formula" method, such as the one adopted by the bankruptcy court in this case, appropriately implements the statutory mandate. SCS, however, contends that the "coerced loan" method, adopted by several Courts of Appeals and by the district court in this case, more accurately reflects the statutory intent.

When a petition is filed under Chapter 13 of the Bankruptcy Code, a bankruptcy court confirms the plan if several conditions are met. *See* 11 U.S.C. §§ 1325(a)(1)-(6).[1] For

---

[1]   The statute provides:

> Except as provided in subsection (b), the court shall confirm a plan if—

(continued...)

secured creditors, this provision offers three possible prerequisites to confirmation, one of which must be satisfied before a Chapter 13 plan can be confirmed. If the secured creditor consents, *see* 11 U.S.C. § 1325(a)(5)(A), or the debtor surrenders the collateral, *see id.* § 1325(a)(5)(C),

---

[1] (...continued)

(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1325(a).

or if the plan invokes 11 U.S.C. § 1325(a)(5)(B), known colloquially as Chapter 13's "cramdown" provision, a Chapter 13 plan will be confirmed, as long as the other conditions of confirmation are met. *See* Todd J. Zywicki, *Cramdown and the Code*, 19 T. Marshall L. Rev. 241, 242-43 (1994). The cramdown provision permits a bankruptcy court to confirm a debtor's Chapter 13 plan over a secured creditor's objection if "the plan provides that the holder of such claim retain the lien securing such claim; and the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B).[2] Both Chapter 11, *see* 11 U.S.C. § 1129(b)(2)(A)(i)(II), and Chapter 12, *see* 11 U.S.C. § 1225(a)(5)(B)(ii), contain analogous cramdown provisions. Courts have considered all three provisions to be similar and have analyzed them interchangeably.[3]

---

[2] The allowed amount of a secured creditor's claim is the value of the collateral. The Code divides a secured creditor's claim into two portions, a secured portion and an unsecured portion. The secured portion is equal to the value of the collateral (for undersecured creditors) on the plan's effective date, the unsecured portion is the amount of the debt still owed to the creditor over and above the value of the collateral. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 239 (1989). With respect to this excess amount, the secured creditor is treated like an unsecured creditor. *See id.*

[3] *See, e.g., Koopmans v. Farm Credit Servs. of Mid-America, ACA*, 102 F.3d 874, 875 (7th Cir. 1996) (citing cases interpreting Chapter 13's cramdown provision in a Chapter 12 case); *In re Smithwick*, 121 F.3d 211, 213 (5th Cir. 1997) (describing the cramdown provisions of Chapter 11 and Chapter 12 as analogous and citing to Chapter 11 cramdown cases in Chapter 12

(continued...)

Before a plan invoking the cramdown provision can be confirmed, a bankruptcy court must make two determinations. First, it must determine the value of the collateral as of the effective date of the plan. *See Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 960-62 (1997). Once that value is determined, the bankruptcy court must then decide upon a stream of payments over the course of the plan that will provide the creditor with "value . . . not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). To compensate a secured creditor for its delay in receiving the value of the collateral, the creditor must receive interest to account for the time value of money. *See* John K. Pearson, et al., *Ending the Judicial Snipe Hunt: The Search for the Cramdown Interest Rate*, 4 Am. Bankr. Inst. L. Rev. 35, 36-38 (1996). Thus, the second determination a bankruptcy court must make is the rate of interest to be charged. This issue has caused significant disagreement among the courts of appeals, bankruptcy courts and commentators. *See* Monica Hartman, Comment, *Selecting the Correct Cramdown Interest Rate in Chapter 11 and Chapter 13 Bankruptcies*, 47 U.C.L.A. L. Rev. 521, 532-44 (1999) (discussing the dominant approaches and the criticism each has received); David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates*, 49 Ala. L. Rev. 435, 443-59 (1998) (discussing the divisions among courts of appeal); Matthew Y. Harris, Comment, *Chapter 13 Cram Down Interest Rates*, 67 Miss. L.J. 567, 569-80 (1997) (discussing the current approaches and their critics).

---

[3] (...continued)
case); *In re Fowler*, 903 F.2d 694, 697 (9th Cir. 1990) (finding that analysis in Chapter 11 cramdown cases also applied to Chapter 12 case); *United States v. Arnold*, 878 F.2d 925, 928 (6th Cir. 1989) (finding cramdown provisions of Chapter 12 and Chapter 13 to be identical).

**B.**

Our ultimate task is to ascertain the policy decision made by Congress in enacting this statutory provision. This task requires that we understand the command of the statute. We therefore begin, as we always must, with the text of the statute. We focus on the plain wording of the provision before us and on the statutory structure of which that provision is a part.[4] Examining both the text of the cramdown provision and the structure of the statute, we think it is clear that Congress intended that, under § 1325(a)(5)(B)(ii), the secured creditor, who is being forced to accept the debtor's plan and to forfeit his right to foreclose and sell the collateral, is to be compensated for the diminution of his present interest in the collateral. In short, from the debtor's perspective, it is necessary to pay for the continued use of the collateral at a rate that will preserve the value of the creditor's interest.

In ascertaining the precise obligation of the debtor under the cramdown provision, it is helpful to compare

---

[4] In the case of an ambiguity in the statute, we sometimes find helpful, as long as it is read with prudence and caution, the legislative history of the provision. Although we have no need to resort to this device here, we note in passing that it is not very helpful to the task at hand. The House Report accompanying the 1978 Bankruptcy Act states that "[v]alue as of the effective date of the plan . . . indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan. The discounting should be based only on the unpaid balance of the amount due under the plan, until that amount, including interest, is paid in full." H.R. Rep. 95-595 at 408, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364. The report does not address the appropriate method of calculating the interest rate.

its requirements to the other provisions of § 1325(a)(5) that offer alternative ways of protecting the interest of a secured creditor in a Chapter 13 plan. We think it is reasonable to presume that Congress intended that each of these options afford the secured debtor somewhat equivalent protection. Certainly, none of the three was designed to provide the debtor or the creditor with a windfall.

The three possibilities are straightforward: (1) a creditor consents to the plan; (2) the debtor turns over the collateral to the creditor; or (3) the debtor invokes the cramdown. A creditor will only consent if the plan adequately protects its interests. *See* Pearson, *supra*, at 49-50 (describing the efforts of creditors and debtors to come to an agreement to avoid bankruptcy litigation). If the creditor receives the collateral, then its rights under state law are vindicated and its contract with the debtor is fulfilled; in such a circumstance, the secured creditor's rights are not impaired by the Bankruptcy Code. The creditor may still seek the unsecured portion of its claim in bankruptcy, but it proceeds as an unsecured creditor and without the preference the Code gives to secured creditors. Given these two alternate modes of protection afforded by the statute, it is logical to conclude that the interest rate under the cramdown provision must put the creditor in a position reasonably equivalent to the position it would be in had it consented to the plan or had it received and then sold the collateral. There seems to be a consensus on this point among courts of appeal that have addressed this issue. All agree that the rate should compensate the creditor for its delay in receiving the value of the collateral. *See, e.g., Koopmans v. Farm Credit Servs. of Mid-America, ACA,* 102 F.3d 874, 874 (7th Cir. 1996); *In re Smithwick,* 121 F.3d 211, 214 (5th Cir. 1997); *In re Valenti,* 105 F.3d 55, 59-60 (2d Cir. 1997); *GMAC v. Jones,* 999 F.2d 63, 66-67 (3d Cir. 1993); *United Carolina Bank v. Hall,* 993 F.2d 1126,

1129-30 (4th Cir. 1993); *In re Fowler*, 903 F.2d 694, 696-97 (9th Cir. 1990); *In re Hardzog*, 901 F.2d 858, 859-60 (10th Cir. 1990); *United States v. Arnold*, 878 F.2d 925, 928-29 (6th Cir. 1989). "If the debtor chooses to maintain possession of the secured collateral . . . then the debtor must compensate the creditor for the full value of the allowed secured claim." *In re Valenti*, 105 F.3d at 59.

## C.

Despite the consensus on the objective of the statute, courts have developed divergent formulae for calculating the interest rate. Even here, however, there is consensus about a starting point. Courts agree that a "market" rate of interest should apply. *See Koopmans*, 102 F.3d at 874-75; *In re Smithwick*, 121 F.3d at 214; *In re Valenti*, 105 F.3d at 63; *GMAC*, 999 F.2d at 66-67; *United Carolina Bank*, 993 F.2d at 1129-30; *In re Fowler*, 903 F.2d 694, 697 (9th Cir. 1990); *In re Hardzog*, 901 F.2d at 859-60; *Arnold*, 878 F.2d at 927-28; *see also* Pearson, *supra* at 40-41; Epstein, *supra* at 443. There is disagreement, however, about what rate of interest will adequately ensure that the creditor receives full value of his secured claim.

### 1.

Under one approach, known as the "cost of funds method," the interest rate is set at the rate the creditor would have to pay to borrow the amount equal to the collateral's value. *See In re Valenti*, 105 F.3d at 64 (holding that, although cost of funds approach "more appropriately reflects the present value of a creditor's allowed claim," it is difficult to administer, and therefore the interest rate should be "fixed at the rate on a United States Treasury

instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan"); 8 Lawrence P. King et al., *Collier on Bankruptcy*, ¶ 1325.06[3][B] (15th ed. 2001) (advocating cost of funds approach). No court of appeals has adopted the cost of funds method without further refinement. In *In re Valenti*, the Second Circuit expressed the view that this method was the best of the approaches employed by the various federal courts, but chose to adopt, for the sake of efficiency and ease of administration, a standard rate for all cramdown cases. *See In re Valenti*, 105 F.3d at 64. As we shall discuss in more detail later, under the Second Circuit approach, the Chapter 13 plan ought to set the interest rate at the rate for Treasury instruments with a maturity equivalent to the repayment schedule set forth in the plan of reorganization. This rate ought then to be adjusted to take into account the creditor's risk in not receiving the payments scheduled under the plan. *See id.* The cost of funds' approach is advocated by *Collier on Bankruptcy* and has been adopted by some bankruptcy and district courts.

The cost of funds method is not without its flaws. First, as the Ninth Circuit has observed, charging an interest rate equal to the creditor's borrowing rate forces the creditor to make a firm commitment to borrow (and repay) funds secured only by the risky stream of payments under the debtor's Chapter 13 plan and the creditor's continuing lien on a depreciating piece of collateral. *See In re Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1506 (9th Cir. 1987). Such a rate does not give the secured creditor value equivalent to his allowed claim. Second, "it is doubtful that the secured creditor has an unlimited supply of credit." Michael E.S. Frankel, *The Emerging Fixed Cramdown Rate Regime*, 2 U. Chi. L. Sch. Roundtable 643, 647 (1995). The cost of funds method presupposes that a creditor will opt to exhaust some of its own credit in or-

der to replace the liquid capital it would have received after foreclosure and sale. Many Chapter 13 creditors are not in a financial position to take on such a commitment and, consequently, the imposition of such terms on them would not afford them the full value of their secured interest and would deprive them of the protection of the cramdown provision. Third, the cost of funds approach is likely to provide a windfall to the debtor. As a practical matter, it allows the debtor to step into his creditor's shoes and pay interest for use of the collateral on the terms that he would enjoy if he were the secured creditor. This approach does not compensate the creditor for the risk that the Chapter 13 plan will fail and leave the creditor with only the remedy of foreclosure and sale of depreciated collateral.

### 2.

A second approach, which is an adaption of the cost of funds method, is the formula method. The Second Circuit, *see In re Valenti*, 105 F.3d 55, 63 (2d Cir. 1997), has adopted the formula method; the Ninth Circuit, *see In re Fowler*, 903 F.2d 694, 698 (9th Cir. 1990), and Eighth Circuit, *see United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir. 1989), have endorsed the formula method but have not adopted an exclusive, strict formula; instead those courts have vested significant discretion in the bankruptcy courts. "[T]he formula approach requires the court to adopt a risk-free market rate as a base, and then add a risk premium corresponding to the court's determination of the riskiness of the reorganization plan." Pearson, *supra*, at 50. As we have noted earlier, the Second Circuit uses the "rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's re-

organization plan" and a risk premium of one to three percent. *In re Valenti*, 105 F.3d at 64.

The formula method as adopted by our colleagues in the Second Circuit has the advantage of being clear and predictable. The base rate is readily ascertainable, and there is a small range of risk adjustment. We do not believe, however, that the formula approach necessarily will produce an interest rate that complies with the statutory requirement that the creditor receive "value . . . [which is] not less than the allowed amount of such claim" over the course of the plan. 11 U.S.C. § 1325(a)(5)(B)(ii). Congress sought to protect the secured creditor who is forced into the cramdown situation with protection against several factors: (1) the possibility that his continued credit to the now-bankrupt debtor would not be repaid; (2) the reality that the collateral will continue to depreciate either at the same rate as it has in the past or at a different rate, depending on the nature of the collateral and the prevailing market conditions; (3) the cost of continuing to service the loan in question. Congress left to the bankruptcy courts the task of ascertaining the appropriate rate which would protect against all of these factors. As this court noted in *Koopmans*, market participants may choose different methods of calculating the market rate of interest for the new situation precipitated by the debtor's invocation of the cramdown provision. *See Koopmans*, 102 F.3d at 875. There are a multitude of possible creditor/debtor relationships subject to the cramdown provision. Each presents its own risks; to adopt a standard interest rate with limited discretion vested in the bankruptcy court only to take into consideration the contingency of nonpayment would not necessarily fulfill the statutory command that the creditor be afforded the full value of his interest at the time the reorganization plan becomes effective. The statutory provision necessarily leaves the particular questions of valua-

tion to the informed discretion of the bankruptcy court. Our adoption of a rigid formula would unduly restrict that discretion. The statute contemplates a more particularized inquiry, and we are bound by Congress' policy choice in this regard.

**3.**

A third approach, and the one that we adopted in *Koopmans*, has been described as the "coerced loan" or the "forced loan" method. Courts taking this view conceptualize the cramdown provision as forcing creditors to extend a new line of credit to the debtor. Consequently, "the creditor is entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk." *Koopmans*, 102 F.3d at 875. This approach views § 1325(a)(5)(B)(ii) as "seek[ing] to put the secured creditor in an economic position equivalent to the one it would have occupied had it received the allowed secured amount immediately, thus terminating the relationship between the creditor and the debtor." *GMAC*, 999 F.2d at 66-67; *see also In re Smithwick*, 121 F.3d at 214.

*Koopmans* was decided under the cramdown provision of Chapter 12, which applies to family farms. *See Koopmans*, 102 F.3d at 874. We wrote that in a cramdown, "the secured creditor is entitled to the 'indubitable equivalence' of its property interest, which means a stream of payments including interest that adds up to the present value of its claim." *Id.* at 874 (quoting *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (L. Hand, J.)). The question there, as here, is: "At what rate of interest will [the secured creditor] be as well off in the reorganization as if

it had been allowed to foreclose on and sell the [collateral]." *Id.* We held that "the creditor is entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk." *Id.* at 875. We so held "[w]ithout implying that 'prime-plus' is the only way to approximate the market rate of interest—for participants in the market may use other methods . . . ." *Id.*

Some courts, including the bankruptcy court in this case, have read our holding in *Koopmans* to endorse the formula method discussed above. It is true that we affirmed the decision of the bankruptcy court, which had:

> approximated *this* by starting with the prime rate of interest, which it found prevalent for new 20-year well-secured agricultural loans at the time, and adding 1.5 percent because it deemed this extension of credit more risky than the norm in light of the Koopmans' sorry repayment record. This produced a floating rate, 10.5 percent (9 percent + 1.5 percent) at the time the bankruptcy court approved the plan.

*Koopmans*, 102 F.3d at 875 (emphasis added). However, "this" was the "market rate of interest, at the time of the hypothetical foreclosure, for loans of equivalent duration and risk." *Id.* at 874-75. In *Koopmans*, the forced loan approach produced a 10.5% interest rate based upon the prime rate plus a risk factor; this result was a realistic approximation of the interest rate that the creditor would have received on a new loan of the same duration and risk because the secured creditor in *Koopmans* was over-secured, and the chosen rate was the one for well-secured agricultural loans. *See id.* at 874-75. *Koopmans* did not endorse a formula approach and should not be read to have endorsed such an approach. As we emphasized in *Koopmans*, "[o]n *this* record, the market's approach is prime-

plus." *Id.* at 875. It is clear that *Koopmans* did not adopt the prime-plus rate; it adopted the coerced loan method, the specific application of which led to the prime-plus rate. *See id.*

Only the Second Circuit has explicitly rejected the forced loan method. *See In re Valenti*, 105 F.3d at 64. The court in *Valenti* thought the coerced loan method inappropriate because it computes " 'present value' to include the profit that the creditor would have generated had the creditor received the value of the collateral immediately." *Id.* at 63. The court elaborated: "The objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately. The purpose is *not* to put the creditor in the same position that it would have been in had it arranged a 'new' loan." *Id.* at 64. The court also opined that "the value of the creditor's allowed claim does not include any degree of profit." *Id.* Like several other circuits, we respectfully decline to adopt this analysis. Like the Third Circuit, *see GMAC*, 999 F.2d at 69, and the Fifth Circuit, *see Smithwick*, 121 F. 3d at 214, we believe that to exclude the element of profit from the fixing of the market rate would violate the statutory directive that the creditor be placed in the same position as the one in which it would have been if it had been allowed to end the lending relationship by repossessing the collateral.

By determining the rate that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated, although not in bankruptcy, *see GMAC*, 999 F.2d at 67 n.4, we acknowledge that we are approximating, not necessarily duplicating precisely, the present value of the collateral to the creditor as that statute requires. The continuation of the

old contract rate to the bankrupt debtor under the supervision of the bankruptcy court will involve some risks that would not be incurred in a new loan to a debtor not in default and also result in some economies.[5] Nevertheless, like our colleagues in the Third Circuit, *see GMAC*, 999 F. 2d at 68-69, and Fifth Circuit, *see Smithwick*, 121 F.3d at 214, we believe that the old contract rate will yield a rate sufficiently reflective of the value of the collateral at the time of the effectiveness of the plan to serve as a presumptive rate. Therefore,

> [i]n the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its current rate is in excess of the contract rate. Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate for a bankruptcy court to require the

---

[5] As the Third Circuit noted in *GMAC*, an extension of the old loan will not involve the usual initiation costs and the bankruptcy trustee will assume some, although not all of the monitoring functions that must be undertaken in the administration of the loan. Other "relational costs" will also be less. *See GMAC*, 999 F.2d at 68. On the other hand, the usual "equity cushion" accompanying loans of this sort may be absent in the case of a coerced extension. *See id.* "An equity cushion exists when the appraised value of the collateral is greater than the value of the loan." *Id.* In a free market, uncoerced by the cramdown provision, a lender might well insist on a sizable equity cushion that is missing here. In a free market, the lender of an extension also might insist on a higher rate.

> debtor to come forward with some evidence that the creditor's current rate is less than the contract rate.

*GMAC*, 999 F.2d at 70-71. The approach we endorse today will, in most cases, provide the best approximation of the proper rate. Thus, the bankruptcy courts are vested with significant discretion in the application of the method described in this opinion.

The district court properly determined that our earlier decision in *Koopmans* determined that the correct approach in ascertaining the appropriate interest rate in a cramdown situation is the coerced loan approach. Nevertheless, because our decision today sufficiently elaborates on that methodology and gives further guidance to the bankruptcy courts on this matter, we believe that the best course is to remand the case to the district court with instructions that the judgment of the bankruptcy court be vacated and that further proceedings consistent with this opinion be held in the bankruptcy court. We believe that fairness requires that both parties be afforded an opportunity to address the factors that we have identified in this opinion and that the bankruptcy court be given the opportunity to employ the methodology that we have set forth today.

## Conclusion

Accordingly, the judgment of the district court is vacated and the case is remanded with instructions. The parties shall bear their own costs of this appeal.

VACATED and REMANDED

ROVNER, *Circuit Judge,* dissenting. My colleagues hold that section 1325(a)(5)(B)(ii) entitles a creditor to the same interest rate that it would charge on a new loan to someone who is situated similarly (except for the bankruptcy) to the debtor. By its own account, the interest rate that SCS charges its customers for sub-prime, used car loans is whatever the market will bear. *In re Till,* No. 99-13425-13, Transcript of Continued Hearings on Trustee's Motion to Dismiss, etc., at 34, 38 (Bankr. S.D. Ind. Feb. 29, 2000). In the Tills' case, that was an eye-popping 21 percent. Compelling a debtor to pay such a burdensome rate of interest diminishes the feasibility of the Chapter 13 plan, *see* § 1325(a)(6); C. Frank Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate,* 32 S.D. L. REV. 42, 43 (1987), reduces the likelihood that unsecured creditors will receive any remuneration, *see In re Scott,* 248 B.R. 786, 793 (Bankr. N.D. Ill. 2000), and is inconsistent with the fresh start that Chapter 13 was intended to provide to debtors, *see Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S. Ct. 695, 699 (1934); H. Rep. No. 95-595, at 117 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6078. First and foremost, however, I believe it is contrary to the language and purpose of the statute.

Chapter 13's "cram down" provision obligates the debtor over the life of the plan to pay his creditor an amount of money "not less than the allowed amount" of the claim. 11 U.S.C. § 1325(a)(5)(B)(ii). Of course, a claim can only be allowed to the extent that it is secured, *see* 11 U.S.C. § 506(a), and so, when the creditor is under-secured as SCS was, the "allowed amount" of the claim corresponds to the value of the collateral underlying the loan (here, the automobile), *id. See ante* at 6 n.2; *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 961, 117 S. Ct. 1879, 1884-85 (1997). This means that the debtor must commit to a stream of payments that ultimately will compensate

the creditor for the present value of the collateral that the debtor has chosen to keep. *Ante* at 7. Furthermore, because the debtor will be paying the creditor for the collateral over the three- to five-year life of the plan, the statute obligates the debtor to pay interest to compensate the creditor for the delay. *E.g., G.M.A.C. v. Jones*, 999 F.2d 63, 66 (3d Cir. 1993); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1129-30 (4th Cir. 1993); *In re Bellamy*, 962 F.2d 176, 185-86 (2d Cir. 1992), *abrogated on other grounds by Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S. Ct. 2106 (1993). In this way, the statute recognizes the time value of money and attempts to place the creditor in the same position it would have been in had the debtor surrendered the collateral, enabling the creditor to liquidate it and reinvest the proceeds. *See Rash*, 520 U.S. at 962, 117 S. Ct. at 1885; *Hall*, 993 F.2d at 1130; *Jones*, 999 F.2d at 66. As for the rate of interest, courts are virtually unanimous in the view that the interest rate imposed under section 1325(a)(5)(B)(ii) should be a "market" rate. *Ante* at 10; Monica Hartman, Comment, *Selecting the Correct Cramdown Interest Rate in Chapter 11 and Chapter 13 Bankruptcies*, 47 UCLA L. REV. 521, 528 (1999); Matthew Y. Harris, Comment, *Chapter 13 Cram Down Interest Rates: Another Day, Another Dollar—A Cry for Help in Ending the Quest for the Appropriate Rate*, 67 MISS. L. J. 567, 569 (1997); Todd J. Zywicki, *Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code*, 19 T. MARSHALL L. REV. 241, 245 (1994). They are divided, however as to which among several market rates most fairly compensates the creditor for the delay in receiving the value of its collateral—the rate at which the creditor could borrow money to replace the collateral that the debtor has chosen to keep (the "cost of funds" approach), the prime rate or a U.S. Treasury rate adjusted upward for the risk of nonpay-

ment (the "formula" approach), or the rate at which the creditor would make the same type of loan to someone like the debtor (the "coerced loan" approach).

The coerced loan approach that my colleagues embrace posits that the debtor's decision to keep the collateral in effect compels the creditor to extend a new loan to the debtor for the value of the collateral. *Ante* at 14; *see Jones*, 999 F.2d at 67, quoting *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir. 1982); *In re Hardzog*, 901 F.2d 858, 860 (10th Cir. 1990). It further presumes that had the debtor instead surrendered the collateral, the creditor would have converted the collateral into cash and invested the money in the same type of loan that the debtor originally obtained—here, a sub-prime used car loan carrying a high rate of interest. *See ante* at 14, citing *Koopmans v. Farm Credit Servs. of Mid-America, ACA*, 102 F.3d 874, 875 (7th Cir. 1996). Based on the notion that the debtor's retention of the collateral has deprived the creditor of this investment opportunity, the coerced loan camp reasons that the debtor must pay the same rate of interest the creditor could have earned had it loaned the amount of the collateral to someone else. *Ante* at 14.

The sole deprivation that can be charged to the debtor, however, is the retention of the collateral, not the investment that the creditor presumably would have made with the proceeds of that collateral. *See In re Valenti*, 105 F.3d 55, 63-64 (2nd Cir. 1997), *abrogated on other grounds by Rash*, 520 U.S. 953, 117 S. Ct. 1879. Had the Tills elected to surrender the collateral, all that SCS would have received is a 1991 Chevrolet S-10 truck, not a new loan package. It would have been SCS' responsibility to sell the truck and then make a new loan with the proceeds of the sale; and, of course, there would have been costs associated with both of those transactions. *See Hall*, 993 F.2d at 1131; *see also Koopmans*,

102 F.3d at 874 (deeming the appropriate question to be "[a]t what rate of interest will [the secured creditor] be as well off in the reorganization as if it had been allowed to foreclose on and sell the [collateral]"). Requiring the debtor to pay the creditor the same rate of interest that the creditor would charge on a new loan to another consumer thus over-compensates the creditor, because it fails to account for the costs that the creditor would incur in funding the new loan. *See* 8 COLLIER ON BANKRUPTCY, ¶ 1325.06, p. 1325-35-36 (Lawrence P. King, et al., eds., 15th rev. ed. 2002); *In re Ivey*, 147 B.R. 109, 116 (M.D.N.C. 1992), *overruled by Hall*, 993 F.2d 1126.

In this respect, the costs of funds approach comes closer to recognizing the economic consequences of the debtor's decision to keep the collateral. *See Valenti*, 105 F.3d at 64. Strictly speaking, the debtor's retention of the collateral does not preclude the creditor from making a new loan, it simply deprives the creditor of an asset that the creditor could convert into money and use to fund the new loan. A straightforward way to account for that deprivation is to ask what it would cost the creditor to obtain the cash equivalent of the collateral from an alternative source. 8 COLLIER, ¶ 1325.06, p. 1325-35; *In re Benson*, 9 B.R. 854, 858 (Bankr. N.D. Ill. 1981); *see also* Carbiener, 32 S.D. L. REV. at 63 (noting that this is consistent with law's general approach to mitigation of damages). Assume, for example, that SCS could borrow the cash equivalent of the Tills' truck at an interest rate of 10 percent and then lend that money to another consumer at a rate of 21 percent. Under that scenario, the cost of the Tills' decision to keep the truck would not be the full 21 percent that SCS would earn on its investment in another consumer loan, but the 10 percent that SCS would have to pay to borrow the money it otherwise would have obtained by liquidating the truck. Critics of the cost of funds approach point out

that a creditor is unlikely to have an unlimited supply of credit and that it may be impractical and unjust to expect the creditor to borrow the funds necessary to replace the collateral that the debtor has chosen to keep. *See ante* at 11-12; *Hall*, 993 F.2d at 1130. Whether the creditor can, will, or should borrow to replace the funds it otherwise would realize from the collateral is entirely beside the point, however. The task at hand is to decide what rate of interest will reasonably compensate the creditor for the delay in receiving the value of the collateral from the debtor. *See* Zywicki, 19 T. MARSHALL L. REV. at 257. The cost of funds approach better approximates this rate by examining what it would cost the creditor to replace the collateral with money from another source.

The principal disadvantage of the cost of funds method is that it calls for an individualized inquiry that will burden the parties and the court and may lead to disparate results depending on an individual creditor's cost of borrowing. *Valenti*, 105 F.3d at 64; *Hardzog*, 901 F.2d at 860. Given the relatively small amounts of money that are involved in a Chapter 13 proceeding, any approach that invites litigation and adds to the cost of the proceeding is undesirable. *See* Carbiener, 32 S.D. L. REV. at 59-60. The rate that ought to prevail under section 1325(a)(5)(B)(ii) is one that is predictable to the parties, and thus readily susceptible to agreement between them without court intervention. *See* § 1325(a)(5)(A).

In those respects, a formulaic approach that employs as a base rate of interest an easily referenced rate like the prime rate or the rate on U.S. Treasury instruments, and which allows for modest enhancements to the base to account for the risk of nonpayment, is superior, and I would commend it to the court. *See Valenti*, 105 F.3d at 64; *United States v. Doud*, 869 F.2d 1144, 1145 (8th Cir. 1989);

Carbiener, 32 S.D. L. REV. at 63-65. The Treasury rate and the prime rate are both easily ascertainable rates that spare the court and the parties of the need for a potentially time-consuming and expensive inquiry into prevailing market rates of interest available to either the debtor or creditor. Each reflects two of the three components of a market interest rate—expected inflation, and "real" interest. *See* Hartman, 47 UCLA L. REV. at 531. The prime rate also includes the third component—the risk of nonpayment (*see id.*)—and in that sense may represent a better starting point than the Treasury rate. *See Koopmans*, 102 F.3d at 875; Hartman, 47 UCLA L. REV. at 545. At the same time, because the prime rate is available to only the most credit-worthy borrowers, its risk component is arguably too small to compensate the creditor for the risk of non-payment by a Chapter 13 debtor. *See Koopmans*, 102 F.3d at 875. Either rate, in any event, can be adjusted upward to account for the greater risk of nonpayment by a debtor in bankruptcy. *Id.* Courts employing the formula approach recognize that enhancements of one hundred to three hundred basis points would normally suffice for this purpose. *E.g.*, *Valenti*, 105 F.3d at 64. What level of enhancement is called for in the individual case is a question wisely left to the bankruptcy court, which is better situated to assess the risk of nonpayment and may adjust the rate accordingly without extensive evidentiary hearings. *See* Hartman, 47 UCLA L. REV. at 545-46; Harris, 67 MISS. L.J. at 582. [1]

---

[1] This is essentially the approach that the bankruptcy court followed here, albeit after hearing testimony as to the prime rate and the prevailing rates of interest in the market for auto-mobile loans. *See In re Till*, No. 99-13425-FJO-13, Order Confirming Amended Plan (Bankr. S.D. Ind. June 27, 2000). A formula

(continued...)

The lower interest rate produced by the formula approach (or for that matter by the cost of funds approach)—seemingly piddling by comparison with the rate produced by the coerced loan approach in a sub-prime loan case like this one—may at first blush appear inadequate to compensate the creditor for the costs that the involuntarily extended lending relationship imposes, including in particular the risk that the debtor will be unable to discharge his obligations under the reorganization plan. *See ante* at 13; *see also Jones*, 999 F.2d at 67, 68-69; *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1506 (9th Cir. 1987). But courts should consider the extent to which the creditor has already been compensated for this risk in the rate of interest that it charged to the debtor in return for the original loan. Sub-prime lenders charge exorbitant rates of interest precisely because there is a high risk that their borrowers will default on their loan obligations. *See* Kathleen C. Engel and Patricia A. McCoy, *A Tale of Three Markets: The Law and Economics of Predatory Lending*, 80 TEX. L. REV. 1255, 1265-66 (2002); Mavis W. Kennedy, *Don't Let Your Client Be Labeled a Predatory Lender*, 89 ILL. B. J. 595, 597 (2001). These lenders understand that a significant number of their borrowers will not make good on their obligations—may, in fact, end up in bankruptcy. Yet, they continue to make high-risk loans because the money they receive from non-defaulting borrowers is enough to offset that risk; they would not remain in business otherwise. In short, the

---

[1] (...continued)
approach that starts with an easily referenced prime or Treasury rate and calls for an enhancement commensurate with the risks posed by the debtor's reorganization plan would largely obviate the need for such testimony. *See* Hartman, 47 UCLA L. REV. at 546-47.

high interest rate on the Tills' used car loan already accounted for the very possibility of bankruptcy (and with it, the Tills' ability to keep their truck rather than surrender it) that has come to pass. Awarding SCS a second risk premium pursuant to section 1325(a)(5)(B)(ii) may well be unnecessary and inappropriate.

Courts must also have in mind the ways in which bankruptcy law and procedure also work to compensate the creditor for the risk of nonpayment. Insofar as the typical automobile loan is concerned, the manner in which the loan collateral is valued for purposes of the bankruptcy itself provides the creditor with substantial compensation. Because the automobile typically is the only collateral securing the loan, and because automobiles depreciate relatively quickly, the creditor typically finds itself under-secured. That brings into play section 506(a) of the Code, which, as I noted at the outset, limits the amount of the creditor's allowed secured claim to the value of the automobile itself. In *Rash*, however, the Supreme Court held that for purposes of section 506(a), that value is to be determined by asking not how much the *creditor* could be expected to realize upon foreclosure and liquidation of the collateral, but by how much the *debtor* would have to pay in order to replace the collateral. 520 U.S. at 965, 117 S. Ct. at 1886. As Chief Judge Wedoff has pointed out, the replacement value of an automobile to the debtor will normally be significantly higher than the wholesale value that the creditor typically could expect to realize if it repossessed and liquidated the vehicle. *Scott*, 248 B.R. at 792. So by requiring the debtor who keeps the collateral to pay his creditor an amount equal to the replacement cost of the vehicle, the Supreme Court has already ensured that the creditor will be afforded significant compensation for the risk of non-payment. *Id.; see also* David G. Epstein, *Don't Go and Do Something Rash About*

*Cram Down Interest Rates*, 49 ALA. L. REV. 435, 455 n.79 (1998). Consequently, "applying a rate of interest that fully reflects risk of nonpayment—like the contract rate in the present case—to a secured claim amount that already includes substantial 'risk protection' results in a windfall for the secured creditor, to the detriment of unsecured creditors." *Scott*, 248 B.R. at 792, 793. Other provisions of the Code also operate, albeit more modestly, to reduce the risk of non-payment along with the costs occasioned by the debtor's election to retain the collateral: (1) Before confirming the Chapter 13 plan, the Bankruptcy Court must be convinced that it is feasible in the sense that the debtor has the resources to meet his obligations, § 1325(a)(6); (2) wage orders can be used to ensure that the debtor does not inadvertently miss payments; (3) unsecured debt can be reduced or restructured; and (4) collection costs to the creditor are eliminated, while administrative costs are borne primarily by the Chapter 13 trustee. *See In re Carson*, 227 B.R. 719, 724 (Bankr. S.D. Ind. 1998); *see also Jones*, 999 F.2d at 69 & n.8; Carbiener, 32 S.D. L. Rev. at 60-62.

I believe that my colleagues are correct to read this court's opinion in *Koopmans* as a nod in the direction of the coerced loan theory that they have elected to adopt; still, *Koopmans* ought not to be viewed as dispositive of the question we decide today. *See* Epstein, 49 ALA. L. REV. at 454 ("[*Koopmans*] can better be described as a case . . . that does not require bankruptcy courts to use any particular approach to determine the market rate."); *Carson*, 227 B.R. at 721 n.5 (noting that *Koopmans* "does not fit neatly into any of the three categories"). Although the language of the *Koopmans* opinion endorses the coerced loan approach, 102 F.3d at 875, the decision actually affirms the bankruptcy court's decision to use the prime rate with an appropriate risk enhancement, *id.* Indeed, courts and

commentators have had some difficulty deciding where in the ongoing debate over the appropriate interest rate *Koopmans* came down, as evidenced by the fact that we have been credited with endorsing all three of the major approaches. *See, e.g., In re Smithwick*, 121 F.3d 211, 214 (5th Cir. 1997) (construing *Koopmans* as adopting the coerced loan approach), *cert. denied*, 523 U.S. 1074, 118 S. Ct. 1516 (1998); Epstein, 49 ALA. L. REV. at 454 (noting that *Koopmans* actually approved the bankruptcy court's use of the formula approach); Harris, 67 Miss. L. J. at 580 & n.74 (construing *Koopmans* as approving cost of funds approach); Timothy D. Moratzka, *Chapter 13 Interest Rate Pegged to Treasury Rate in Second Circuit*, 14 AM. BANKR. INST. J. 16, 16 (1997) (same). In truth, the consequences of the choice were modest in *Koopmans*, because the nature of the debt at issue in that Chapter 12 case (an over-secured farm mortgage) rendered the gap between the prime rate and the prevailing market rate for comparable agricultural loans small—indeed, once the bankruptcy court had enhanced the prime rate for additional risk, the two rates were roughly equivalent. *See* 102 F.3d at 875; *Koopmans v. Farm Credit Servs.*, 196 B.R. 425, 428 (N.D. Ind. 1996). By contrast, the disparity here (as in many other Chapter 13 cases involving sub-prime consumer loans) is dramatic, so that use of a market rate for a comparable consumer loan will have adverse consequences that we did not address in *Koopmans*.

The search for a "market" rate that will place the creditor in the same position that it would have been in had it been able to foreclose on the loan is in a sense futile, because given a choice, a creditor would almost always prefer to take possession of the collateral immediately rather than accept a stream of payments over time for the value of that collateral. *See Rash*, 520 U.S. at 962-63, 117 S. Ct. at 1885; *see also Ivey*, 147 B.R. at 117-18. That choice has been taken away from the creditor, however, by opera-

tion of a statute that aims to help the debtor by allowing him to keep an asset—like an automobile—which may be vital to his ability to generate income and attend to his family's day-to-day needs. Because this situation is a creature of legislation rather than the market, the policy considerations reflected in the statute cannot be ignored. A creditor is entitled to interest sufficient to compensate it for the delay in receiving the value of the collateral securing the loan, and the rate at which interest is ordered must reflect the risk of non-payment. To some extent, as I have noted, SCS has already been compensated for that risk through the high rate of interest it originally charged the Tills and other borrowers like them; that rate took into account the very possibility of default that came to pass. To the extent that the Tills' retention of the truck imposes new risks on SCS, the valuation of collateral at its replacement cost provides a substantial cushion to account for those risks. Overcompensating the creditor by demanding that the debtor pay interest as high as the market for high-risk loans will bear greatly increases the burden on the debtor, and far from the fresh start that Chapter 13 was intended to give him, puts him back in the very situation that brought him into bankruptcy. That burden works to the detriment not only of the debtor, but to that of his other creditors, secured and unsecured.

I respectfully dissent.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*