ILANA DIAMOND ROVNER, Circuit Judge,
dissenting.
My colleagues hold that section 1325(a) (5) (B) (ii) entitles a creditor to the same interest rate that it would charge on a new loan to someone who is situated similarly (except for the bankruptcy) to the debtor. By its own account, the interest rate that SCS charges its customers for sub-prime, used car loans is whatever the market will bear. In re Till, No. 99-13425-13, Transcript of Continued Hearings on Trustee’s Motion to Dismiss, etc., at 34, 38 (Bankr.S.D.Ind. Feb. 29, 2000). In the Tills’ case, that was an eye-popping 21 percent. Compelling a debtor to pay such a burdensome rate of interest diminishes the feasibility of the Chapter 13 plan, see § 1325(a)(6); C. Frank Carbiener, Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate, 32 S.D. L. REV. 42, 43 (1987), reduces the likelihood that unsecured creditors will receive any remuneration, see In re Scott, 248 B.R. 786, 793 (Bankr.N.D.Ill.2000), and is inconsistent with the fresh start that Chapter 13 was intended to provide to debtors, see Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); H. Rep. No. 95-595, at 117 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6078. First and foremost, however, I believe it is contrary to the language and purpose of the statute.
Chapter 13’s “cram down” provision obligates the debtor over the life of the plan to pay his creditor an amount of money “not less than the allowed amount” of the claim. 11 U.S.C. § 1325(a)(5)(B)(ii). Of course, a claim can only be allowed to the extent that it is secured, see 11 U.S.C. § 506(a), and so, when the creditor is under-secured as SCS was, the “allowed amount” of the claim corresponds to the value of the collateral underlying the loan (here, the automobile), id. See ante at 587 *594 n. 2; Associates Commercial Corp. v. Rash, 520 U.S. 953, 961, 117 S.Ct. 1879, 1884-85, 138 L.Ed.2d 148 (1997). This means that the debtor must commit to a stream of payments that ultimately will compensate the creditor for the present value of the collateral that the debtor has chosen to keep. Ante at 587. Furthermore, because the debtor will be paying the creditor for the collateral over the three- to five-year life of the plan, the statute obligates the debtor to pay interest to compensate the creditor for the delay. E.g., G.M.A.C. v. Jones, 999 F.2d 63, 66 (3d Cir.1993); United Carolina Bank v. Hall, 993 F.2d 1126, 1129-30 (4th Cir.1993); In re Bellamy, 962 F.2d 176, 185-86 (2d Cir.1992), abrogated on other grounds by Nobelman v. American Sav. Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). In this way, the statute recognizes the time value of money and attempts to place the creditor in the same position it would have been in had the debtor surrendered the collateral, enabling the creditor to liquidate it and reinvest the proceeds. See Rash, 520 U.S. at 962, 117 S.Ct. at 1885; Hall, 993 F.2d at 1130; Jones, 999 F.2d at 66. As for the rate of interest, courts are virtually unanimous in the view that the interest rate imposed under section 1325(a)(5)(B)(ii) should be a “market” rate. Ante at 589; Monica Hartman, Comment, Selecting the Correct Cramdown Interest Rate in Chapter 11 and Chapter 13 Bankruptcies, 47 UCLA L. REV. 521, 528 (1999); Matthew Y. Harris, Comment, Chapter 13 Cram Down Interest Rates: Another Day, Another Dollar—A Cry for Help in Ending the Quest for the Appropriate Rate, 67 MISS. L.J. 567, 569 (1997); Todd J. Zywicki, Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code, 19 T. MARSHALL L. REV. 241, 245 (1994). They are divided, however as to which among several market rates most fairly compensates the creditor for the delay in receiving the value of its collateral — the rate at which the creditor could borrow money to replace the collateral that the debtor has chosen to keep (the “cost of funds” approach), the prime rate or a U.S. Treasury rate adjusted upward for the risk of nonpayment (the “formula” approach), or the rate at which the creditor would make the same type of loan to someone like the debtor (the “coerced loan” approach).
The coerced loan approach that my colleagues embrace posits that the debtor’s decision to keep the collateral in effect compels the creditor to extend a new loan to the debtor for the value of the collateral. Ante at 591; see Jones, 999 F.2d at 67, quoting Memphis Bank & Trust Co. v. Whitman, 692 F.2d 427, 429 (6th Cir.1982); In re Hardzog, 901 F.2d 858, 860 (10th Cir.1990). It further presumes that had the debtor instead surrendered the collateral, the creditor would have converted the collateral into cash and invested the money in the same type of loan that the debtor originally obtained — here, a sub-prime used car loan carrying a high rate of interest. See ante at 591, citing Koopmans v. Farm Credit Servs. of Mid-America, ACA 102 F.3d 874, 875 (7th Cir.1996). Based on the notion that the debtor’s retention of the collateral has deprived the creditor of this investment opportunity, the coerced loan camp reasons that the debtor must pay the same rate of interest the creditor could have earned had it loaned the amount of the collateral to someone else. Ante at 591.
The sole deprivation that can be charged to the debtor, however, is the retention of the collateral, not the investment that the creditor presumably would have made with the proceeds of that collateral. See In re Valenti 105 F.3d 55, 63-64 (2nd Cir.1997), abrogated on other grounds by Rash, 520 *595 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148. Had the Tills elected to surrender the collateral, all that SCS would have received is a 1991 Chevrolet S-10 truck, not a new loan package. It would have been SCS’ responsibility to sell the truck and then make a new loan with the proceeds of the sale; and, of course, there would have been costs associated with both of those transactions. See Hall, 993 F.2d at 1131; see also Koopmans, 102 F.3d at 874 (deeming the appropriate question to be “[a]t what rate of interest will [the secured creditor] be as well off in the reorganization as if it had been allowed to foreclose on and sell the [collateral]”). Requiring the debtor to pay the creditor the same rate of interest that the creditor would charge on a new loan to another consumer thus over-compensates the creditor, because it fails to account for the costs that the creditor would incur in funding the new loan. See 8 COLLIER ON BANKRUPTCY, ¶ 1325.06, p. 1325-35-36 (Lawrence P. King, et al., eds., 15th rev. ed.2002); In re Ivey, 147 B.R. 109, 116 (M.D.N.C.1992), overruled by Hall, 993 F.2d 1126.
In this respect, the costs of funds approach comes closer to recognizing the economic consequences of the debtor’s decision to keep the collateral. See Valenti, 105 F.3d at 64. Strictly speaking, the debtor’s retention of the collateral does not preclude the creditor from making a new loan, it simply deprives the creditor of an asset that the creditor could convert into money and use to fund the new loan. A straightforward way to account for that deprivation is to ask what it would cost the creditor to obtain the cash equivalent of the collateral from an alternative source. 8 COLLIER, ¶ 1325.06, p. 1325-35; In re Benson, 9 B.R. 854, 858 (Bankr.N.D.Ill.1981); see also Carbiener, 32 S.D. L. REV. at 63 (noting that this is consistent with law’s general approach to mitigation of damages). Assume, for example, that SCS could borrow the cash equivalent of the Tills’ truck at an interest rate of 10 percent and then lend that money to another consumer at a rate of 21 percent. Under that scenario, the cost of the Tills’ decision to keep the truck would not be the full 21 percent that SCS would earn on its investment in another consumer loan, but the 10 percent that SCS would have to pay to borrow the money it otherwise would have obtained by liquidating the truck. Critics of the cost of funds approach point out that a creditor is unlikely to have an unlimited supply of credit and that it may be impractical and unjust to expect the creditor to borrow the funds necessary to replace the collateral that the debtor has chosen to keep. See ante at 588-89; Hall, 993 F.2d at 1130. Whether the creditor can, will, or should borrow to replace the funds it otherwise would realize from the collateral is entirely beside the point, however. The task at hand is to decide what rate of interest will reasonably compensate the creditor for the delay in receiving the value of the collateral from the debtor. See Zywicki, 19 T. MARSHALL L. REV. at 257. The cost of funds approach better approximates this rate by examining what it would cost the creditor to replace the collateral with money from another source.
The principal disadvantage of the cost of funds method is that it calls for an individualized inquiry that will burden the parties and the court and may lead to disparate results depending on an individual creditor’s cost of borrowing. Valenti, 105 F.3d at 64; Hardzog, 901 F.2d at 860. Given the relatively small amounts of money that are involved in a Chapter 13 proceeding, any approach that invites litigation and adds to the cost of the proceeding is undesirable. See Carbiener, 32 S.D. L. REV. at 59-60. The rate that ought to prevail under section 1325(a)(5)(B)(ii) is one that is *596 predictable to the parties, and thus readily susceptible to agreement between them without court intervention. See § 1325(a)(5)(A).
In those respects, a formulaic approach that employs as a base rate of interest an easily referenced rate like the prime rate or the rate on U.S. Treasury instruments, and which allows for modest enhancements to the base to account for the risk of nonpayment, is superior, and I would commend it to the court. See Valenti, 105 F.3d at 64; United States v. Doud, 869 F.2d 1144, 1145 (8th Cir.1989); Carbiener, 32 S.D. L. REV. at 63-65. The Treasury rate and the prime rate are both easily ascertainable rates that spare the court and the parties of the need for a potentially time-consuming and expensive inquiry into prevailing market rates of interest available to either the debtor or creditor. Each reflects two of the three components of a market interest rate — expected inflation, and “real” interest. See Hartman, 47 UCLA L. REV. at 531. The prime rate also includes the third component — the risk of nonpayment (see id.) — and in that sense may represent a better starting point than the Treasury rate. See Koopmans, 102 F.3d at 875; Hartman, 47 UCLA L. REV. at 545. At the same time, because the prime rate is available to only the most credit-worthy borrowers, its risk component is arguably too small to compensate the creditor for the risk of nonpayment by a Chapter 13 debtor. See Koopmans, 102 F.3d at 875. Either rate, in any event, can be adjusted upward to account for the greater risk of nonpayment by a debtor in bankruptcy. Id. Courts employing the formula approach recognize that enhancements of one hundred to three hundred basis points would normally suffice for this purpose. E.g., Valenti, 105 F.3d at 64. What level of enhancement is called for in the individual case is a question wisely left to the bankruptcy court, which is better situated to assess the risk of nonpayment and may adjust the rate accordingly without extensive evidentiary hearings. See Hartman, 47 UCLA L. REV. at 545-46; Harris, 67 MISS. L.J. at 582.[1]
The lower interest rate produced by the formula approach (or for that matter by the cost of funds approach) — seemingly piddling by comparison with the rate produced by the coerced loan approach in a sub-prime loan case like this one — may at first blush appear inadequate to compensate the creditor for the costs that the involuntarily extended lending relationship imposes, including in particular the risk that the debtor will be unable to discharge his obligations under the reorganization plan. See ante at 590; see also Jones, 999 F.2d at 67, 68-69; In re Camino Real Landscape Maintenance Contractors, Inc., 818 F.2d 1503, 1506 (9th Cir.1987). But courts should consider the extent to which the creditor has already been compensated for this risk in the rate of interest that it charged to the debtor in return for the original loan. Sub-prime lenders charge exorbitant rates of interest precisely because there is a high risk that their borrowers will default on their loan obligations. See Kathleen C. Engel and Patricia A. McCoy, A Tale of Three Markets: The Law and Economics of Predatory *597 Lending, 80 TEX. L. REV. 1255, 1265-66 (2002); Mavis W. Kennedy, Don’t Let Your Client Be Labeled a Predatory Lender, 89 ILL. B.J. 595, 597 (2001). These lenders understand that a significant number of their borrowers will not make good on their obligations — may, in fact, end up in bankruptcy. Yet, they continue to make high-risk loans because the money they receive from non-defaulting borrowers is enough to offset that risk; they would not remain in business otherwise. In short, the high interest rate on the Tills’ used car loan already accounted for the very possibility of bankruptcy (and with it, the Tills’ ability to keep their truck rather than surrender it) that has come to pass. Awarding SCS a second risk premium pursuant to section 1325(a)(5)(B)(ii) may well be unnecessary and inappropriate.
Courts must also have in mind the ways in which bankruptcy law and procedure also work to compensate the creditor for the risk of nonpayment. Insofar as the typical automobile loan is concerned, the manner in which the loan collateral is valued for purposes of the bankruptcy itself provides the creditor with substantial compensation. Because the automobile typically is the only collateral securing the loan, and because automobiles depreciate relatively quickly, the creditor typically finds itself under-secured. That brings into play section 506(a) of the Code, which, as I noted at the outset, limits the amount of the creditor’s allowed secured claim to the value of the automobile itself. In Rash, however, the Supreme Court held that for purposes of section 506(a), that value is to be determined by asking not how much the creditor could be expected to realize upon foreclosure and liquidation of the collateral, but by how much the debtor would have to pay in order to replace the collateral. 520 U.S. at 965, 117 S.Ct. at 1886. As Chief Judge Wedoff has pointed out, the replacement value of an automobile to the debtor will normally be significantly higher than the wholesale value that the creditor typically could expect to realize if it repossessed and liquidated the vehicle. Scott, 248 B.R. at 792. So by requiring the debtor who keeps the collateral to pay his creditor an amount equal to the replacement cost of the vehicle, the Supreme Court has already ensured that the creditor will be afforded significant compensation for the risk of non-payment. Id.; see also David G. Epstein, Don’t Go and Do Something Rash About Cram Down Interest Rates, 49 ALA. L. REV. 435, 455 n. 79 (1998). Consequently, “applying a rate of interest that fully reflects risk of nonpayment — like the contract rate in the present case — to a secured claim amount that already includes substantial ‘risk protection’ results in a windfall for the secured creditor, to the detriment of unsecured creditors.” Scott, 248 B.R. at 792, 793. Other provisions of the Code also operate, albeit more modestly, to reduce the risk of non-payment along with the costs occasioned by the debtor’s election to retain the collateral: (1) Before confirming the Chapter 13 plan, the Bankruptcy Court must be convinced that it is feasible in the sense that the debtor has the resources to meet his obligations, § 1325(a)(6); (2) wage orders can be used to ensure that the debtor does not inadvertently miss payments; (3) unsecured debt can be reduced or restructured; and (4) collection costs to the creditor are eliminated, while administrative costs are borne primarily by the Chapter 13 trustee. See In re Carson, 227 B.R. 719, 724 (Bankr.S.D.Ind.1998); see also Jones, 999 F.2d at 69 & n. 8; Carbiener, 32 S.D. L.Rev. at 60-62.
I believe that my colleagues are correct to read this court’s opinion in Koop-mans as a nod in the direction of the *598 coerced loan theory that they have elected to adopt; still, Koopmans ought not to be viewed as dispositive of the question we decide today. See Epstein, 49 ALA. L. REV. at 454 (“[Koopmans] can better be described as a case ... that does not require bankruptcy courts to use any particular approach to determine the market rate.”); Carson, 227 B.R. at 721 n. 5 (noting that Koopmans “does not fit neatly into any of the three categories”). Although the language of the Koopmans opinion endorses the coerced loan approach, 102 F.3d at 875, the decision actually affirms the bankruptcy court’s decision to use the prime rate with an appropriate risk enhancement, id. Indeed, courts and commentators have had some difficulty deciding where in the ongoing debate over the appropriate interest rate Koopmans came down, as evidenced by the fact that we have been credited with endorsing all three of the major approaches. See, e.g., In re Smithwick, 121 F.3d 211, 214 (5th Cir.1997) (construing Koopmans as adopting the coerced loan approach), cert. denied, 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998); Epstein, 49 ALA. L. REV. at 454 (noting that Koopmans actually approved the bankruptcy court’s use of the formula approach); Harris, 67 Miss. L.J. at 580 & n. 74 (construing Koopmans as approving cost of funds approach); Timothy D. Moratzka, Chapter 13 Interest Rate Pegged to Treasury Rate in Second Circuit, 14 AM. BANKR. INST. J. 16, 16 (1997) (same). In truth, the consequences of the choice were modest in Koopmans, because the nature of the debt at issue in that Chapter 12 case (an over-secured farm mortgage) rendered the gap between the prime rate and the prevailing market rate for comparable agricultural loans small — indeed, once the bankruptcy court had enhanced the prime rate for additional risk, the two rates were roughly equivalent. See 102 F.3d at 875; Koopmans v. Farm Credit Servs., 196 B.R. 425, 428 (N.D.Ind.1996). By contrast, the disparity here (as in many other Chapter 13 cases involving sub-prime consumer loans) is dramatic, so that use of a market rate for a comparable consumer loan will have adverse consequences that we did not address in Koopmans.
The search for a “market” rate that will place the creditor in the same position that it would have been in had it been able to foreclose on the loan is in a sense futile, because given a choice, a creditor would almost always prefer to take possession of the collateral immediately rather than accept a stream of payments over time for the value of that collateral. See Rash, 520 U.S. at 962-63, 117 S.Ct. at 1885; see also Ivey, 147 B.R. at 117-18. That choice has been taken away from the creditor, however, by operation of a statute that aims to help the debtor by allowing him to keep an asset — like an automobile — which may be vital to his ability to generate income and attend to his family’s day-to-day needs. Because this situation is a creature of legislation rather than the market, the policy considerations reflected in the statute cannot be ignored. A creditor is entitled to interest sufficient to compensate it for the delay in receiving the value of the collateral securing the loan, and the rate at which interest is ordered must reflect the risk of non-payment. To some extent, as I have noted, SCS has already been compensated for that risk through the high rate of interest it originally charged the Tills and other borrowers like them; that rate took into account the very possibility of default that came to pass. To the extent that the Tills’ retention of the truck imposes new risks on SCS, the valuation of collateral at its replacement cost provides a substantial cushion to account for those risks. Over *599 compensating the creditor by demanding that the debtor pay interest as high as the market for high-risk loans will bear greatly increases the burden on the debtor, and far from the fresh start that Chapter 13 was intended to give him, puts him back in the very situation that brought him into bankruptcy. That burden works to the detriment not only of the debtor, but to that of his other creditors, secured and unsecured.
I respectfully dissent.